UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CV 2697 (GBD) (DF)

ABBY HIRSCH,

                        Plaintiff,

        - against -

GOODSTEIN MANAGEMENT, INC.,

                        Defendant.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT GOODSTEIN MANAGEMENT, INC.'S MOTION FOR SUMMARY JUDGMENT

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
**150 East 42nd Street**
**New York, New York 10017-5639**
**(212) 490-3000**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................ 2

PLAINTIFF'S COMPLAINT ................................................................................................. 2

THE FAIR CREDIT REPORTING ACT ................................................................................ 3

SUMMARY JUDGMENT STANDARD .................................................................................. 4

ARGUMENT .......................................................................................................................... 5

    Point One: The December 5, 2005 Social Search Was Not A "Consumer
    Report" Pertaining to Plaintiff. .......................................................................................... 5

    Point Two: The First and Fourth Causes of Action -- Negligent VIolation of the
        Acts -- Must Be Dismissed as a Matter of Law. ........................................................ 6

    Point Three: The December 14, 2005 Social Search Is Not A "Consumer Report. .............. 7

    Point Four: The December 14, 2005 Search Was Performed For A Permissible
        Purpose. ................................................................................................................... 11

        A.    Goodstein Had A Legitimate Business Need For Conducting the
            Social Search on Hirsch. ............................................................................... 12

        B.    Public Policy Dictates That a Real Estate Management Company's
            Review of a Sex Offender Search in the Process of Lease Renewal is
            A Legitimate Business Need and Not a Basis for a Violation of the
            FCRA. ......................................................................................................... 14

    Point Five: The December 14, 2005 Social Search Was Not Obtained Under False
        Pretenses. ................................................................................................................. 16

    Point Six: Goodstein Did Not Willfully Violate the FCRA. ............................................... 22

    Point Seven: Plaintiff's General Business Law § 349 Claim Fails ...................................... 24

CONCLUSION ....................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

### FEDERAL CASES

*Ali v. Vikar Management*, 994 F. Supp. 292, 492, 495-496
(S.D.N.Y. 1998)............................................................................. 4, 7, 12, 13, 17, 18

*Baker v. Bronx-Westchester Investigations*, 850 F. Supp. 260 (S.D.N.Y. 1994)................2

*Barash v. Ford Motor Credit Corp.*, 2007 U.S. Dist. LEXIS 44641 (E.D.N.Y.
June 20, 2007)..............................................................................................22

*Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151 (11th Cir. 1991) .................6

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..................................................5

*Cohen v. J.P. Morgan Chase & Co.*, 498 F.3d 111 (2d Cir. 2007) ..................................24

*Daley v. Haddonfield Lumber*, 943 F. Supp. 464 (D.N.J. 1996)......................................19

*Dalton v. Capital Associated Industrial, Inc.*, 257 F.3d 409 (4th Cir. 2001) ...................22

*Dotzler v. Perot*, 914 F. Supp. 328 (E.D. Mo. 1996)......................................................4, 7

*Edge v. Professional Claims Bureau, Inc.*, 64 F. Supp. 2d 115 (E.D.N.Y. 1999).............11

*Gelman v. State Farm Mutual Automobile Insurance Co.*, 2007 U.S. Dist. LEXIS
58237 (E.D. Pa. 2007) ..............................................................................18

*Graziano v. TRW Inc.*, 877 F. Supp. 53 (D. Mass 1995)......................................18, 19, 20

*Hyde v. Hibernia National Bank*, 861 F.2d 446 (5th Cir. 1988) .........................................6

*Ippolito v. WNS, Inc.*, 864 F.2d 440 (7th Cir. 1988)............................................................3

*Kline v. 1500 Massachusetts Avenue Apt. Corp.*, 439 F.2d 477 (1970).....................15, 16

*Korotki v. Attorney Services Corp.*, 931 F. Supp. 1269 (D. Md. 1996) ...........................11

*Lusk v. TRW, Inc*, 1999 U.S. App. LEXIS 1848 (6th Cir. 1999)......................................22

*Manso v. Santamarina & Associates*, 2005 U.S. Dist. LEXIS 7316 (S.D.N.Y.
2005).......................................................................................................19, 20

*Marcus v. AT&T Co.*, 138 F.3d 46 (2d Cir. 1998)...............................................................24

*Maurizio v. Goldsmith*, 230 F.3d 518 (2d Cir. 2000) ........................................................24

*Northrop v. Hoffman of Simsbury, Inc.*, 12 Fed. Appx. 44 (2d Cir. 2001).......................22

*Pettus v. TRW Consumer Credit Service, et.al.*, 879 F. Supp. 695 (W.D. Texas )..............6

*Pinner v. Schmidt*, 805 F.2d 1258 (5th Cir. 1986).............................................................22

*Reynolds v. Lemay Buick-Pontiac-GMC-Caddillac, Inc.*, 2007 U.S. Dist. LEXIS
    *55641 (E.D. Wis. 2007)*.................................................................................................3

*Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 127 S. Ct. 2201 (2007) ........22, 23

*Scott v. Real Estate Finance Group*, 183 F.3d 97, 99 (2d Cir. 1999)............................2, 19

*Smith v. Bob Smith Chevrolet, Inc.*, 275 F. Supp. 2d 808 (W.D. Kentucky 2003)............12

*Trikas v. Universal Card Services Corp.*, 351 F. Supp. 2d 37, 41 (E.D.N.Y. 2005) ....4, 12

*United States ex rel. K & R Ltd. Partnership v. Mass. Housing Finance Agency*,
    530 F.3d 980 (D.C. Cir. 2008)......................................................................................23

*Vlasek v. Wal-Mart Stores, Inc.*, 2008 U.S. Dist. LEXIS 55761 (S.D. Tex. July
    22, 2008)..........................................................................................................................6

*Zamora v. Valley Federal Sav. & Loan Association*, 811 F.2d 1368 (10th Cir.
    1987).........................................................................................................................19, 20

*Zeller v. Samia*, 758 F. Supp. 775 (D.C. Mass. 1991).......................................................11

## STATE CASES

*Basso v. Miller*, 40 N.Y.2d 233 (1976) .............................................................................15

*Burgos v. Aqueduct Realty Corp.*, 92 N.Y.2d 544, 684 N.Y.S.2d 139 [1998]............15, 16

*Jackson-Ott v. Mack*, A.D.3d 1025; 817 N.Y.S.2d 473 (4th Dept. 2006).........................15

*Klapper v. Shapiro*, 154 Misc. 2d 459, 586 N.Y.S.2d 846 (Sup. Ct., New York
    Cty. 1992)........................................................................................................................2

*Knudsen v. Lax*, 2007 NY Slip Op 27333; 17 Misc. 3d 350; 842 N.Y.S.2d 341;
    (Cty. Ct., Jefferson Cty. 2007) ................................................................................14, 15

*Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 429 N.Y.S.2d 606 (1980) ..................... 15

*Park W. Mgt. Corp. v. Mitchell*, 47 N.Y.2d 316, 418 N.Y.S.2d 310 (1979)..................... 15

*Raghu v. 24 Realty Co.*, 7 A.D.3d 455, 777 N.Y.S.2d 487 (2004).................................... 15

*Stutman v. Chemical Bank*, 95 N.Y.2d 24, 709 N.Y.S.2d 892 (2000) .............................. 24

**STATUTES**

15 U.S.C. §1681 *et seq.* .................................................................................................... 1

15 U.S.C. §1681b ......................................................................................................... 3, 12

15 U.S.C. §1681a (d) (1) ................................................................................................... 3

15 U.S.C. § 1681q .................................................................................... 4, 5, 16, 18, 19

15 U.S.C. §1681b(f) .......................................................................................................... 4

15 U.S.C. § 1681b(a)(3)(F)(ii)..................................................................................... 4, 12

15 U.S.C. §1681b(a)(3)(F) ............................................................................................... 12

15 U.S.C. § 1681b(a)(3)(F)(ii)......................................................................................... 4

15 U.S.C.S. § 1681n(a)................................................................................................... 22

16 C.F.R. Part 600 Appendix (2007).......................................................................... 3, 4

Correction Law § 168-1(5) ............................................................................................. 14

Fed. R. Civ. P. 56............................................................................................... 2, 5, 25

New York General Business Law Article 25 (GBL §380)................................................. 1

New York General Business Law Article 25 (GBL §349)........................................... 1, 24

New York Rent Stabilization Law and Code [N.Y.C.Admin.Code §§ 26-501;
    9 NYCRR Parts 2520-2530]). .................................................................................. 8

Real Property Law § 265-b(1) ....................................................................................... 15

**MISCELLANEOUS**

http://criminaljustice.state.ny.us/nsor/search_index.htm...................................................11

http://en.wikipedia.org/wiki/TRW.......................................................................................9

http://www.nsopw.gov/Core/OffenderSearchCriteria.aspx...............................................11

http://www.familywatchdog.us/ ........................................................................................11

## PRELIMINARY STATEMENT

In this action, plaintiff Abby Hirsch, seeks to recover for purported violations of (1) Federal Fair Credit Reporting Act (15 USC §§ 1681 *et seq.*) ("FCRA"); and (2) New York General Business Law Articles 25 (New York Fair Credit Reporting Act) (GBL § 380 *et seq.*); and 22-A (Deceptive Business Practices) (GBL § 349). Specifically, Hirsch contends that when she sought renewal of the lease for her rent-stabilized apartment on Central Park West, defendant Goodstein Management Inc., a real estate management company, obtained "credit reports" and "information" pertaining to her, maintained by credit reporting agencies First Advantage SafeRent ("FAS") and Experian Credit Information Services ("Experian"), without having a legitimate purpose for doing so and under false pretenses in violation of the FCRA and the analogous New York State statutes. (Exhibit A, ¶ 2). Discovery on this matter is complete and the evidence proves that Goodstein is entitled to summary judgment on all claims, for the following reasons: the "social search" requested by Goodstein does not constitute a "consumer report" and/or "consumer information" and, thus, is not within the scope of either the FCRA or the related New York State FCRA. Alternatively, even if this Court considers the "social search" obtained by Goodstein to be a "consumer report" or "consumer information," the evidence proves that Goodstein had a legitimate business for obtaining it and clearly did not obtain it under "false pretenses" as plaintiff has alleged.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant Goodstein Management Inc. respectfully refers the Court to the accompanying

Rule 56.1 Statement of Undisputed Material Facts[1].

## PLAINTIFF'S COMPLAINT

In the present action, Hirsch alleges that on December 5, 2005 and December 14, 2005,

Goodstein accessed and obtained credit reports and information pertaining to her maintained by

First Advantage SafeRent ("FAS") and Experian Credit Information Services ("Experian")

without having a legitimate purpose for doing so and under false pretenses, in violation of the

Federal Fair Credit Reporting Act (the "FCRA"); the New York Fair Credit Reporting Act (the

"NYFCRA"); and the New York Deceptive Business Practices Act (the "NYDBPA")

(collectively hereinafter referred to as the "Acts").[2] (Exhibit A).

As damages, Hirsch seeks statutory damages pursuant to the FCRA, statutory damages

for violations of the New York Deceptive Business Practices act, punitive damages, attorneys'

fees, and an injunction barring Goodstein from accessing consumer credit reports without a

permissible purpose, under false pretenses, or without authorization, pursuant to the NYFCRA.

Plaintiff's complaint initially sought actual damages; however, in July 2008, plaintiff withdrew

her claim for actual damages via a stipulation that was so-ordered by this Honorable Court.

---

[1]  All references to the Goodstein's Rule 56.1 Statement of Undisputed Material Facts will hereinafter be referenced as "SUMF, ¶___."

[2]  Generally, courts have interpreted the Federal FCRA and the New York version of its Federal counterpart, the NYFCRA, similarly. *See Scott v. Real Estate Fin. Group, 183 F.3d 97,* (2d Cir. 1999). *Baker v. Bronx-Westchester Investigations,* 850 F. Supp. 260 (S.D.N.Y. 1994); *Klapper v. Shapiro, 154 Misc.* 2d 459, 586 N.Y.S.2d 846 (Sup. Ct., New York Cty. 1992) (giving same interpretations to parallel federal and state credit reporting provisions). As such, except where otherwise noted, the analysis contained herein will be made under the FCRA, but will also collectively cover any similar analysis that would be performed under the NYFCRA.

## THE FAIR CREDIT REPORTING ACT

The FCRA regulates "consumer reporting agencies" in their preparation and dissemination of "consumer reports," *see e.g.,* 15 U.S.C. § 1681b (defining circumstances under which a consumer reporting agency may issue a consumer report). In pertinent part, 15 U.S.C. §1681a (d) (1), defines a "consumer report" as follows:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or part for the purpose of serving as a factor in establishing the consumer's eligibility for –
>
> a) credit or insurance to be used primarily for personal, family, or household purposes;
>
> b) employment purposes; or
>
> c) any other purpose authorized under section 604 [15 U.S.C. §1681b].

15 U.S.C. § 1681a(d)(1).

"If a report is not a 'consumer report,' then the [FCRA] does not usually apply to it." 16 C.F.R. Part 600 Appendix (2007). Moreover, "not all reports containing information on a consumer are 'consumer reports.'" *Ippolito v. WNS, Inc.,* 864 F.2d 440, 449 (7th Cir. 1988). Pursuant to the "used or expected to be used" language in the statute, a credit report is a "consumer report" under the FCRA if: (1) the person who requests the report actually uses the report for one of the "consumer purposes" set forth in the FCRA; (2) the consumer reporting agency which prepares the report "expects" the report to be used for one of the "consumer purposes" set forth in the FCRA; or (3) the consumer reporting agency which prepared the report originally collected the information contained in the report expecting it to be used for one of the "consumer purposes" set forth in the FCRA. *See Ippolito v. WNS, Inc.,* 864 F.2d 440, *supra; see generally, Reynolds v. Lemay Buick-Pontiac-GMC-Caddillac, Inc.,* 2007 U.S. Dist. LEXIS

55641 (E.D. Wis. 2007).   Searches limited to a consumer's name and address alone, without any

implication as to their credit worthiness, credit standing, credit capacity, character, general

reputation, personal characteristics, or mode of living, are not considered "consumer reports."

*Dotzler v. Perot,* 914 F. Supp. 328, 330 (E.D. Mo. 1996); *see also*, *Ali v. Vikar Mgmt.,* 994 F.

Supp. 292 (S.D.N.Y. 1998) (*citing* 16 C.F.R. Part 600, App. at § 603(d)(4)(F)).

15 U.S.C. § 1681q provides consumers protection from those who obtain "information"

on them under "false pretenses".  That section states:

> Any person who knowingly and willfully obtains information on a
> consumer, from a consumer reporting agency under false pretenses
> shall be fined not more than $5,000 or imprisoned not more than
> on year, or both.

15 U.S.C. § 1681q.

The FCRA also protects consumers from any 'person' who obtains a consumer report for

an "impermissible purpose." *See Trikas v. Universal Card Servs. Corp.*, 351 F. Supp.2d 37, 41

(E.D.N.Y. 2005). (quoting 15 U.S.C.  § 1681b(f)).  15 U.S.C. §1681b sets forth those purposes

for which it is permissible for a consumer reporting agency to furnish a consumer report. One

such authorized purpose is:

> (3) to a person which it has reason to believe
>
> > (F) otherwise has a legitimate business need for the
> > information –
> >
> > > (ii) to review an account to determine whether the
> > > consumer continues to meet the terms of the account.

15 U.S.C. § 1681b(a)(3)(F)(ii).

## SUMMARY JUDGMENT STANDARD

The "plain language of Rule 56(c) mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56.

## ARGUMENT
### POINT I

### The December 5, 2005 Social Search Was
### Not A "Consumer Report" Pertaining to Plaintiff

Plaintiff's complaint contains allegations arising out of two searches allegedly performed by Goodstein – one on December 5, 2005 and a second one on December 14, 2005. (Exhibit A, ¶ 15). When asked about the allegations in her complaint stemming from the December 5, 2005 search, plaintiff had no evidence of a search being conducted on her for that date. (Exhibit C, pp. 35-38). In reality, the documentary evidence in this case established that although Goodstein requested a "social search" from FAS on December 5, 2005, it was for "Abby Hirsch" with social security number ending in ***-**-1758. (Exhibit B). Plaintiff admitted at her deposition that this was not her social security number and that her social security number is ▮▮▮▮▮▮▮.[3] (Exhibit C, p. 8). Thus, no search was actually run on the plaintiff, Abby Hirsch, on December 5, 2005. (Exhibit M) As such, plaintiff's attempt to recover damages for a search on December 5, 2005 should be denied and summary judgment should be granted to Goodstein on this claim. Moreover, even if this Court were to deem that a search was conducted on the plaintiff on December 5, 2005, for the reasons set forth below (with respect to the December 14, 2005 social search) there is no viable claim against Goodstein under the Acts.

---

[3] Redacted for privacy purposes.

**POINT II**

**The First and Fourth Causes of Action – Negligent Violation of the Acts --
Must be Dismissed as a Matter of Law**

The FCRA permits a consumer injured by any *negligent* failure to comply with any requirement imposed by the Act to sue for the actual damages sustained. *Hyde v. Hibernia Nat. Bank*, 861 F.2d 446 (5th Cir. 1988). The FCRA does not impose strict liability for errors and in cases of a negligent violation only provides a remedy for consumers who are actually damaged by a defendant's failure to comply with the requirements of the Act. *Pettus v. TRW Consumer Credit Service, et.al.*, 879 F. Supp. 695, 697 (W.D. Texas ) (citing *Hyde v. Hibernia National Bank*, 861 F.2d 446, 448 (5th Cir. 1988)); *Vlasek v. Wal-Mart Stores, Inc.*, 2008 U.S. Dist. LEXIS 55761, *19 (S.D. Tex. July 22, 2008). Therefore, proof of actual damages is an essential component for an action alleging anything other than a willful under the FCRA. *Id.* It is plaintiff's burden to come forward with evidence of actual damages. *Cahlin v. General Motors Acceptance Corp.* 936 F.2d 1151 (11th Cir. 1991).

On July 18, 2008, the plaintiff voluntarily withdrew "all claims in the complaint for actual damages" by So-Ordered Stipulation. (Exhibit K; *see also* Exhibit C p. 4). As claims for negligent violation of the Acts require actual damages and plaintiff has no actual damages, she cannot maintain her first and fourth causes of action – both founded on negligent violations of the FCRA and the NYFCRA. Accordingly, Goodstein is entitled to summary judgment dismissing these two causes of action.

## POINT III

### The December 14, 2005 Social Search Is Not A "Consumer Report"

Courts have already determined that social searches, such as the one run on the plaintiff, are not considered a "credit reports" within the meaning of the FCRA. *See Dotzler v. Perot*, 914 F. Supp. 328, 330-31 (E.D. Mo. 1996) (holding that a search for updated addresses, which search results contained consumers' names, current addresses, former addresses, and (for some consumers) social security information was not a "credit report" within the meaning of the FCRA); *Ali v. Vikar Mgmt.*, 994 F. Supp. 492, 499 (S.D.N.Y. 1998) ("A report limited solely to the consumer's name and address alone, with no connotations as to credit worthiness or other characteristics, does not constitute a 'consumer report,' if it does not bear on any of the seven factors [from § 1681a(d)].").

Contrary to the allegation in the complaint, the December 14, 2005 "social search" was not a "consumer report." In the case at bar, the evidence conclusively establishes that Goodstein Management only ordered a "social search" from FAS, designated on the invoice from FAS as a "C03" search. Goodstein was charged $2.07 for the search. (SUMF, ¶ 29; Exhibit D, ¶¶ 21-22; Exhibit G, GM460; ). "Credit reports" ordered from FAS cost significantly more. (SUMF, ¶ 30; Exhibit D, ¶ 21-22). Jose Mercado, Goodstein's property manager and head of its leasing department testified that there are two situations where Goodstein ordered searches from FAS with respect to: (a) prospective tenants; and (b) existing tenants. (SUMF, ¶ 4; Exhibit D, ¶ 5; Exhibit E, pp. 101-102, 106, 164-165, 172, 175-176, 185-186, 189-200).

The first search type involved a prospective tenant. When an individual first applied for an apartment, they were required to submit a signed application which contained authorization for Goodstein to run a "credit report" on them. (SUMF, ¶ 8; Exhibit D, ¶ 6; Exhibit E, pp. 98-

100).  Goodstein was completely aware of the fact that it was required to and always did obtain authorization from the prospective tenant to run a credit search. (SUMF, ¶ 6; Exhibit D, ¶ 6; Exhibit E, pp. 98-100).

The second type of search performed by Goodstein was the "social search."  (SUMF, ¶ 4; Exhibit D, ¶ 8; Exhibit E,  pp. 101-102, 106, 164-165, 172, 175-176, 185-186, 189-200). Goodstein used the "social search" on existing tenants that were looking to renew their leases for rent-stabilized apartments managed by Goodstein. (SUMF, § 10; Exhibit D, ¶¶ 8, 10-12; Exhibit E, pp. 101-102, 106, 164-165, 172, 175-176, 185-186, 189-200).  Every month a report was printed out listing those apartments managed by Goodstein that were coming up for renewal. (Exhibit D, ¶ 10; Exhibit E, pp. 172).  Upon receipt of that list, Goodstein ordered a "social search" from FAS for the existing tenant (SUMF, ¶ 10-11; Exhibit D, ¶¶ 8-12; Exhibit E, pp. 101-102, 106, 164-165, 172, 175-176, 185-186, 189-200; Exhibit I), to see if there was any indication that the apartment was not, in fact, being used as the renewing tenant's "primary residence" (SUMF, ¶ 10-13, 18, 38; Exhibit D, ¶10-12, 18, 27; Exhibit E, pp. 101-102, 106, 109, 165-166, 172, 175, 185-186, 189-200; Exhibit I).  A "social search" is a search used to "find names, addresses and places of employment." (SUMF, ¶ 13; Exhibit G, GM318, 321, 326, 356). Of critical importance, "[n]o credit information is revealed using Social Search." (GM 276-277); and, thus, does not require authorization from the tenant.  (SUMF, ¶ 12; Exhibit D, ¶ 13; Exhibit E, pp. 106, 185-186; Exhibit G).

Goodstein obtained "social searches" as part of its investigation into a tenant's "primary residence" – a condition for renewing and sustaining a rent-stabilized unit is that the unit must be the tenant's "primary residence" (*see* New York Rent Stabilization Law and Code [N.Y.C.Admin.Code §§ 26-501 through 26-520; 9 NYCRR Parts 2520-2530]). (SUMF, ¶ 10-13,

18, 38; Exhibit D, ¶10-12, 18, 27; Exhibit E, pp. 101-102, 106, 109, 165-166, 172, 175, 185-186, 189-200; Exhibit I).    A tenant who does not use the rent-stabilized apartment as their primary residence is not entitled to renew their rent-stabilized lease. (SUMF, ¶ 18; Exhibit D, ¶ 12). Goodstein does not obtain information, or run any other reports, other than the "social search" on its current tenants (SUMF, ¶ 11; Exhibit D, ¶ 9; Exhibit E, pp. 112-113).

To run a "social search" Goodstein would access the FAS database via the internet.   To obtain a social search, Goodstein would input the tenant's name and social security number into the FAS online system (SUMF, ¶ 23, 25; Exhibit D, ¶ 15, 17; Exhibit F, p. 126, 131, 194-195).[4] The user would then press the type of search requested (e.g., "social search") from a menu of search options available through FAS.  (SUMF, § 24; Exhibit D, ¶ 16; Exhibit E, pp. 131). Some of the searches offered by FAS included: (A) RegistryCheck – covering court records; (b) Tenant Account Record – providing tenant lease performance and payment trends; (c) Wanted Fugitive Search; (d) Credit Reports – consumer credit profiles from three national bureaus: TRW, CBI/Equifax and TransUnion; and (e) Social Search.  (SUMF 24; Exhibit D ¶ 16; Exhibit G, GM321).

After Goodstein obtained a social search, Jose Mercado would review the address information on the first page of the search to determine if the tenant had any other addresses listed as their residence.  If so, Mr. Mercado would then initiate an investigation including, for example, an attempt to establish whether or not the tenant was present in the building all the time. (SUMF, ¶ 10; Exhibit D, ¶ 12; Exhibit E, pp. 166-169).  Goodstein would also speak to the

_____

[4] The materials provided by FAS to Goodstein provided the following: "Here's how Social Search works. As an authorized subscriber, you supply an individual's Social Security number on an inquiry into the TRW consumer credit database. Then, a unique TRW system searches for, and retrieves, the names and addresses associated with that Social Security number." (GM 277).  TRW's credit reporting business was spun off in 1996 and is now known as Experian.  http://en.wikipedia.org/wiki/TRW

apartment owner and call building personnel in an attempt to see who was actually living in the apartment. (SUMF, ¶ 22; Exhibit E, pp. 151-154, 166-169).

In the instant case, plaintiff's rent-stabilized lease for her apartment at 25 Central Park West was up for renewal in or about December 2005. (SUMF, ¶ 34; Exhibit A, ¶ 14; Exhibit C, p. 8; Exhibit D, ¶ 24). On December 14, 2005, a "social search" was ordered from FAS by providing plaintiff's name and social security number and pressing the screen button on the FAS internet interface that requested a "social search." (Exhibit. A ¶ 19; SUMF, ¶ 37; Exhibit D, ¶ 26; Exhibit E, pp. 126-127, 148, 160-161; Exhibit H). One of Goodstein's leasing agents, Angela Rodriguez, ran the search. (SUMF, ¶ 37; Exhibit A, ¶19, Exhibit D, ¶ 26; Exhibit E, pp. 126-127, 148, 160-161; Exhibit H). As detailed above, the purpose of running the "social search" was to ascertain whether plaintiff was compliant with New York's rent stabilization laws. (SUMF, ¶ 10-13, 18, 38; Exhibit D, ¶10-12, 18, 27; Exhibit E, pp. 101-102, 106, 109, 165-166, 172, 175, 185-186, 189-200; Exhibit I). The results from the "social search" yielded the exact type of result which justified Goodstein's use of the search. The December 14, 2005 social search (Exhibit H) disclosed that the plaintiff also apparently had an address/residence in Martha's Vineyard, Massachusetts.[5] (SUMF, ¶ 40; Exhibit C, pp. 15-16; Exhibit D, ¶ 30; Exhibit H).

Plaintiff will likely argue that the "social search" is a "consumer report" because FAS unilaterally included a "multi-state sex offender search" (which came back negative) as part of the "social search."[6] However, sex offender status is publicly available and, thus, such

---

[5] Goodstein does not address the merits of the holdover proceeding against the plaintiff resulting from her failure to use the apartment as her primary residence it is not relevant to the analysis of any violation of the FCRA.

[6] This information was not requested by Goodstein and began to appear on social searches received by Goodstein without explanation. (Exhibit D, ¶ 33; Exhibit E, pp. 107-108, 187, 190). Goodstein was not charged any additional amount when FAS began including the sex offender search as part of the "social search."

information should not be deemed protected under the FCRA. *See e.g.* Sex Offender Registry at the New York State Division of Criminal Justice Services, 4 Tower Place, Albany, NY 12203-3764 (http://criminaljustice.state.ny.us/nsor/search_index.htm); U.S. Department of Justice's Dru Sjodin National Sex Offender Public Website (search tool allowing a user to submit a single national query to obtain information about sex offenders through a number of search options) (http://www.nsopw.gov/Core/OffenderSearchCriteria.aspx); and Family Watchdog website (providing a nationwide search for registered sex offenders) (http://www.familywatchdog.us/).

Accordingly, Goodstein did not obtain a consumer report or consumer information regarding the plaintiff and, thus, did not violate the FCRA or any related state law statutes.

## POINT IV

### The December 14, 2005 Search Was Performed For A Permissible Purpose

If, however, this Court were to determine that Goodstein did obtain a "consumer report" or information regarding the plaintiff by ordering the "social search," the next area of inquiry is to determine whether Goodstein had a "permissible purpose" to do so. The issue of whether a consumer report has been obtained for a "permissible purpose" is a question of law that is properly decided in the context of a motion for summary judgment. *Edge v. Professional Claims Bureau, Inc.*, 64 F. Supp 2d 115, 118 (E.D.N.Y. 1999); *Korotki v. Attorney Servs. Corp.*, 931 F. Supp. 1269 (D. Md. 1996); *Zeller v. Samia,* 758 F. Supp. 775 (D.C. Mass. 1991) (granting summary judgment and finding defendant had a legitimate business need for the information in connection with a "business transaction" involving the plaintiff). A showing of a permissible purpose is a complete defense. *Edge v. Professional Claims Bureau, Inc.*, 64 F. Supp. 2d 115, 117 (E.D.N.Y. 1999) (citations omitted).

### A. Goodstein Had A Legitimate Business Need For Conducting the Social Search On Hirsch

Assuming, <u>arguendo</u>, that the December 14, 2005 "social search" was, as plaintiff contends, a "consumer report," obtaining the report was authorized under 15 U.S.C. §1681b, meaning that, contrary to plaintiff's allegations, no violation of the FCRA occurred. As set forth above, 15 U.S.C. § 1681b(a)(3)(F)(ii) permits disclosure of "consumer reports" "to review an account to determine whether the consumer continues to meet the terms of the account." Thus, §1681b(a)(3)(F)(ii) permits the use of a "consumer report" to determine whether a consumer continues to be eligible on that account. *See Smith v. Bob Smith Chevrolet, Inc.*, 275 F. Supp. 2d 808 (W.D. Kentucky 2003).

Here, plaintiff contends that Goodstein acted with an impermissible purpose when it obtained the "social search." (Exhibit A, ¶¶ 30-35). However, plaintiff's argument overlooks Goodstein's basis for obtaining the report at issue. *See generally, Trikas v. Universal Card Servs. Corp.,* 351 F. Supp. 2d 37 (E.D.N.Y. 2005) (stating that the "plain language of the statue . . . focuses on the intent of the party obtaining the [credit] report.") *Id.* (emphasis omitted). Goodstein's acquisition and use of the "social search" fits within the plain text of the statutory description set forth in 15 U.S.C. §1681b(a)(3)(F) as they used the report "to determine whether [plaintiff] continue[d] to meet the terms of [her] account," i.e, whether she remained eligible for the benefit of a rent-stabilized lease renewal. *See* 15 U.S.C. §1681b(a)(3)(F).

Based upon the wording of the allegations in the complaint, it is apparent that plaintiff seeks to rely on *Ali v. Vikar Mgmt. Ltd.,* 994 F. Supp. 492 (S.D.N.Y. 1998)[7] to support her contention that there was no permissible purpose for Goodstein to conduct the "social search" as

---

[7] Plaintiff's counsel was the attorney of record on the case.

part of the renewal of plaintiff's lease on her rent-stabilized apartment. *Ali* is vividly distinguishable from the case at bar. In *Ali,* the Court expressly found that the address-based searches (e.g., "social search" type reports) conducted on two tenants were not "credit reports" within the purview of the FDCPA. *Id.* at 499. Second, with respect to the other plaintiff-tenant in *Ali,* the defendant had accessed that plaintiff's credit reports which the court stated was not a "permissible purpose" when evaluating the tenants' renewal of a rent-stabilized apartment. The *Ali* court held that inasmuch as under New York law a landlord was required to renew a rent-stabilized tenant's lease without regard to the tenant's "credit worthiness", the credit of the plaintiffs was not an issue that the defendant had any reason to explore. *Id.* at 500 (emphasis added). Thus, it was improper for the defendant in *Ali* to view that plaintiff's credit.

In the case at bar, there is absolutely no evidence that Goodstein accessed the plaintiff's "credit" information but instead requested only a non-protected "social search." SUMF, ¶ 38; Exhibit D, ¶ 27; Exhibit E, pp. 101-102, 106, 109, 165-166, 172, 175, 185-186, 189-200; Exhibit I, at 34). In fact, the "social search" ordered by Goodstein from FAS was vastly different from the "credit reports" offered by those companies. FAS separately offers the distinct option for a client like Goodstein to purchase a "credit report" (defined by FAS as a search which provides "consumer credit profiles from the three national bureaus: TRW, CBI/Equifax and Trans Union) versus a "social search" (defined as a "search by social security number through 1, 2 or all 3 national credit bureaus, to find names, addresses and places of employment"). (Exhibit G, GM318, 321, 326, 356). There is no evidence to suggest that a credit report or any financial and/or credit information was ever requested, accessed or received concerning the plaintiff.

Unlike in *Ali*, where the question before the Court related to a landlord's decision to access "credit" information on its tenant at the time of renewal of a rent-stabilized apartment,

Goodstein purposely avoided any attempt to access plaintiff's "credit" information. As such, the holding in *Ali* is inapplicable to this case. As discussed extensively above, the "social search" obtained from FAS was run to see if plaintiff's rent-stabilized apartment was truly her "residence," (*See* Point III, *supra*; SUMF, ¶ 38; Exhibit D, ¶ 27; Exhibit E, pp. 101-102, 106, 109, 165-166, 172, 175, 185-186, 189-200; Exhibit I, at 34), and, thus, whether she continued to meet the criteria for keeping her rent-stabilized apartment on Central Park West (e.g., the permissible purpose of determining whether plaintiff continued to meet the terms of her account) (SUMF, ¶ 38; Exhibit D, ¶ 27; Exhibit E, pp. 101-102, 106, 109, 165-166, 172, 175, 185-186, 189-200; Exhibit I, at 34). The evidence confirms that Goodstein obtained the "social search" for a legitimate business purpose and summary judgment is warranted in favor of Goodstein.

### B. Public Policy Dictates That a Real Estate Management Company's Review of a Sex Offender Search in the Process of Lease Renewal is A Legitimate Business Need and Not a Basis for a Violation of the FCRA

Plaintiff also contends that because the "social search" provided by FAS included a multi-state sex offender search, it violated her rights under the FCRA. The inclusion of a sex offender search in a "social search" run by a real estate management company is consistent with public policy and, thus, cannot be deemed to violate the FCRA. If Goodstein, as a real estate management company handling the leasing of numerous apartments in Manhattan, received a report that a sex offender was listed as a renewal tenant, that information would have been relayed to Goodstein's attorneys for whatever legal action was deemed appropriate. (SUMF ¶ 17; Exhibit D, ¶ 36; Exhibit E p. 189, 190-193). New York courts have consistently held that the State's public policy is to protect potential victims of a sex offender from "the risk of a repeat offense by such sex offender and the threat posed to the public safety." *Correction Law* § 168-l(5); *Knudsen v. Lax*, 2007 NY Slip Op 27333; 17 Misc. 3d 350; 842 N.Y.S.2d 341; (Cty. Ct.,

Jefferson Cty. 2007). The law limits where a sex offender can go, and relies upon a system that alerts members of the public about where these offenders are and where they live so "steps can be taken to protect one's self or family or others by being on guard against becoming a victim of a 'repeat offense by such sex offender'." *Knudsen.*

Real Property Law §265-b(1) states that "[i]n every written . . . lease . . . the landlord . . . shall be deemed to covenant and warrant that the . . . occupants of such premises shall not be subjected to any conditions which would be dangerous . . . or detrimental to their life, health or safety." In *Park W. Mgt. Corp. v. Mitchell,* 47 N.Y.2d 316, 418 N.Y.S.2d 310 (1979), the New York Court of Appeals stated that "[t]hreats to the health and safety of the tenant . . . determines the reach of the warranty of habitability" *Id.* at 328. It is further well-established that "[l]andlords have a common-law duty to take minimal precautions to protect tenants from foreseeable harm,' including a third party's foreseeable criminal conduct" *Jackson-Ott v. Mack,* 30 A.D.3d 1025; 817 N.Y.S.2d 473 (4th Dept. 2006)(quoting *Burgos v. Aqueduct Realty Corp.,* 92 N.Y.2d 544, 684 N.Y.S2d 139 [1998]); *see also Raghu v. 24 Realty Co.* 7 A.D.3d 455, 777 N.Y.S.2d 487 (2004); *Nallan v. Helmsley-Spear, Inc.,* 50 N.Y.2d 507, 429 N.Y.S.2d 606 (1980). Although a landlord is not an insurer of the personal safety of its tenants, the landlord must exercise reasonable care to protect its tenants against any foreseeable dangers. *Basso v. Miller,* 40 N.Y.2d 233 (1976).

In *Kline v. 1500 Massachusetts Ave. Apt. Corp.* 439 F.2d 477 (1970) the United States Court of Appeals for the District of Columbia held that a landlord is under a duty to protect tenants against the foreseeable criminal acts of third parties, where the landlord has notice of criminal occurrences in those portions of the premises exclusively within his control, which are likely to recur, and where the landlord has the exclusive power to take preventive action, in order

to "minimize the predictable risk to his tenants." *Id.* at 481.  The Court's decision stressed that the landlord in modern urban society stands in a special relationship to its residential tenants analogous to the innkeeper-guest relationship of prior days *Id.*

In addition to the fact that any sex offender information at issue is publicly available (*see* Point III, *infra)* and contrary to plaintiff's testimony that she does not care if sex offenders live in her building (Exhibit C, p. 24), the case law demonstrates that the public entrusts their landlords and managing agents to ensure their safety and this information should not be ignored if it is obtained by the landlord.  With numerous residential buildings all over New York City, plaintiff cannot seriously argue that public policy does not dictate that Goodstein should be allowed to confirm that a tenant, up for renewal, is not a convicted sex offender.  As a matter of public policy, therefore, the fact that "social searches" requested by Goodstein contained a sex offender search cannot be used to anchor a claim of a violation of the FCRA.  As a matter of public policy, the search performed by Hirsch was for a legitimate business purpose and no violation of the FCRA occurred.

## POINT V
### The December 14, 2005 Social Search Was Not Obtained Under "False Pretenses"

Plaintiff's third cause of action alleges that Goodstein violated 15 U.S.C. § 1681q by obtaining the December 14, 2005 report under "false pretenses." (Exhibit A, ¶¶ 19, 36-39).[8] Plaintiff contends that the defendant "knowingly and willfully obtain[ed] information from FAS pertaining [to plaintiff] under false pretenses" but fails to even allege what those "false pretenses" were. (Exhibit A, ¶ 37-38).  At her deposition, plaintiff stated that the "false pretenses" were that Goodstein never had her permission to run any kind of check on her and, in

---

[8]  Plaintiff's sixth cause of action alleges a "false pretenses" violation under the analogous NYFCRA.

running the check provided FAS with false information on the application. (Exhibit C, pp. 40-44).  She claims that the false information was that when Goodstein ordered the "social search," Goodstein entered its address instead of hers on the search application (Exhibit C, pp. 40-44).

Even taking plaintiff's assertions as true, plaintiff cannot articulate any reason as to why Goodstein would "falsely" input its address rather than plaintiff's when conducting the search. Beyond the simple fact that there was simply no basis for Goodstein to input its own address when conducting the "social search," the evidence confirms that plaintiff's assertion is nothing more than pure surmise.  Moreover, as set forth in the Affidavit of Jose Mercado, the user interface for ordering a "social search" from FAS only required two fields to conduct the search – the applicant's name and social security number – and those were the only two fields entered by Goodstein (SUMF, ¶ 25; Exhibit D, ¶ 17).

Attempting to salvage plaintiff's "false pretenses" theory at the June 24, 2008 hearing held in this matter, plaintiff's counsel articulated a second "false pretense" claim, arguing that Goodstein secured the social search under "false pretenses" because Goodstein did not have a written authorization from plaintiff to run the search and, the lack of an authorization violated the terms of the contract between Goodstein and FSA.  (Exhibit F; Exhibit J, pp. 33-43; Exhibit L).[9] Plaintiff's argument, however, ignorees the critical fact that the "social search" (Exhibit M) sought by Goodstein was not a "consumer report," was obtained with a permissible purpose (*See* Points III and IV *supra)* and certainly was not secured using false pretenses.

Again, plaintiff undoubtedly will rely on *Ali v. Vikar Mgmt.* 994 F. Supp. 492 (S.D.N.Y. 1998). (Exhibit I, at 34-35) to support her "false pretenses" assertion.  In addition to the fact that

---

[9] As discussed below, it is clear that plaintiff is attempting to make this case fit within the facts of the *Ali v. Vikar Management* case when the facts are not analogous.

the extremely lenient standard for finding "false pretenses" used by the *Ali* Court has been increasingly tightened by the Federal Courts in the ten years since that decision, the facts in *Ali* are distinguishable from the case at bar.  In *Ali*, the Court held the defendant accessed the plaintiff's "credit report, not merely address information." *Id.* at 495-496.  As detailed above, the distinction between obtaining a "credit report" and "address information" is critical.  Second, in *Ali* the defendant "certifie[d] and warrant[ed] that it [would] request and use credit information received from TRW *solely in connection with credit transactions, or, if applicable, for employment purposes . . .* or for other 'permissible purposes' as defined by the Fair Credit Reporting Act, 15 U.S.C. Section 1681 et seq." *Id.* at 495 (emphasis added).  Thus, the Court in *Ali* clearly focused on the fact that the defendant had unnecessarily and inappropriately obtained **credit** information on the plaintiff in the process of renewing a rent-stabilized lease after indicating that the information was being sought with respect to credit or employment reasons.  In the case at bar, Goodstein purposely did not seek a "credit report", yet plaintiff still claims a violation of the FCRA.

Moreover, the Federal Courts have consistently applied a strict reading of the term "false pretenses," requiring actual *intent* to deceive, rather than merely the omission of providing notice to the credit agency of the permissible purpose for conducting the search.  For example, in *Gelman v. State Farm Mut. Auto Ins. Co.,* 2007 U.S. Dist. LEXIS 58237 (E.D. Pa. 2007), the plaintiff alleged that the defendant obtained a consumer report from Experian under "false pretenses."  The Court held that in addition to claiming an impermissible purpose, a plaintiff is required to demonstrate "a calculated attempt to mislead another in order to obtain information." *Id.* (citations omitted).  Likewise, in *Graziano v. TRW Inc.*, 877 F. Supp. 53, 57 (D. Mass 1995), the Court concluded that "'false pretenses' under §1681q requires not merely a purpose which is

not technically in compliance with the purposes set forth in §1681b, but a calculated attempt to mislead another in order to obtain information." The court analyzed the level of *mens rea* required under 1681q:

> It has generally been held that a court determines whether a request for a consumer report has been made under 'false pretenses' by looking at the permissible purposes for which consumer reports may be obtained under § 1681b of FCRA. *See Zamora v. Valley Fed. Sav. & Loan Assn.*, 811 F.2d 1368, 1370 (10th Cir. 1987); Zeller, 758 F. Supp. at 781…Black's Law Dictionary defines "false pretense" as a "representation of some fact or circumstance which is not true and is calculated to mislead." Webster's Collegiate Dictionary includes the following relevant definition of 'pretense': 'professed rather than real intention or purpose.'
>
> *Id.* at 57.

More importantly, even if a misrepresentation has been made regarding the pretense for obtaining the credit report, it is "non-actionable if the FCRA would permit the requesting party to receive the credit report for an albeit unstated but permissible purpose." *Id.* at 14 (citing *Daley v. Haddonfield Lumber*, 943 F. Supp. 464, 467 (D.N.J. 1996). The Second Circuit has held that "[a] person cannot obtain information to which he has a right under false pretenses." *Manso v. Santamarina & Assocs.*, 2005 U.S. Dist. LEXIS 7316, *48-49 (S.D.N.Y. Apr. 26, 2005) (citing *Scott v. Real Estate Fin. Group*, 183 F.3d 97, 100 (2d Cir. 1999)). In fact, "a report requester does not violate Section 1681q by giving a false reason for its request if it has an independent legitimate basis for requesting the report." *Id.* (citing *Scott*, 183 F.3d at 99). Thus, the standard for establishing "false pretenses" is clearly more stringent that when first articulated by the Court in *Ali*.

In the case at bar, there is nothing in the record to support the allegation that Goodstein ordered the "social search" under "false pretenses." While plaintiff will claim that "false pretenses" exist because the contract between Goodstein and FAS allegedly required written

authorization from the plaintiff before ordering the "social search," that argument fails on two separate grounds. First, plaintiff's reliance solely on the contract language ignores the law – which provides that even without authorization, there can be no "false pretense" if there is a permissible purpose. Second, the contract between FAS and Goodstein only speaks to "consumer reports" obtained by Goodstein from FAS, not "social searches." (Exhibit F).

A discussed above, Goodstein had a permissible purpose for conducting the social search – to ascertain plaintiff's true residency and eligibility to renew her rent-stabilized lease. (*See* Points III and IV, *supra*; (SUMF, ¶ 10-13, 18, 38; Exhibit D, ¶10-12, 18, 27; Exhibit E, pp. 101-102, 106, 109, 165-166, 172, 175, 185-186, 189-200; Exhibit I). As note above, even if Goodstein gave "a false reason for its request," it cannot be liable under the FCRA because it had "an independent legitimate basis for requesting the report." *Manso, supra.* (citing *Scott*, 183 F.3d at 99; *see* Point IV, *supra*). As such, there can be no "false pretenses." *See Granziano*; *Zamora*, *supra*.

Furthermore, the record indicates that Goodstein did not make any false representations to FAS concerning the basis for conducting the searches. (SUMF, ¶ 33; Exhibit D, ¶ 14; Exhibit E pp. 185-186). To the extent plaintiff claims that Goodstein conducted the "social search" in violation of its stated purpose in the agreement with FAS, this allegation is equally disproved by the evidence. (Exhibit F, at GM287-290). The Agreement provides, in pertinent part:

> 1. For consideration Registry agrees to provide to Customer upon request ***consumer reports* ("Report(s)"), as defined under the [FCRA] ("Act"),** as it exists or is hereafter amended.
>
>          \*       \*      \*
>
> 2. Every time Customer [Goodstein] requests a report from Registry [FAS], unless written notification is given with each request to the contrary, Customer certifies that it is obtaining the **report** for its exclusive one-time use as an end user, for tenant screening purposes, and not for any purpose outside the permissible purposes of the Act, this Agreement, or any applicable addendum for service.

*     *     *

3.  Customer also agrees to obtain applicant's written authorization to obtain **consumer report information** on applicant, even if authorization is not required under the Act.

(Exhibit F) (emphasis added).

Thus, by the express terms of the Agreement, it applied to those instances where FAS provided "consumer reports . . . as defined in the federal Fair Credit Reporting Act." GM288, ¶1.  As discussed above, what Goodstein ordered (the "social search") clearly was not a "consumer report" and, thus, was not encompassed by the terms of the Agreement requiring authorizations.  The fact that FAS knew Goodstein (and other users) would not have an "authorization" to conduct a social search is confirmed by the materials provided by FAS to Goodstein describing the social search.  FAS's own marketing materials provided that "[n]o credit information is revealed using Social Search."  (GM 276 – second page).  In fact, FAS marketed the "social search" to Goodstein as something that allowed a customer to "search by social security numbers to *"find names, addresses and places of employment"* and to be used "locate *former* customers, college alumni or *missing* shareholders."  (Exhibit G, at GM277, 318, 321, 326, 356) (emphasis added).  It defies logic to claim that the FAS/Goodstein Agreement anticipated that written authorization would be obtained for a search that was geared for locating "former" customers or "missing" shareholders.  The "social search" clearly did not (and could not) require written authorization from the target of the search.  Moreover, Goodstein expressly advised FAS' employees during on-site reviews that the social searches were being used for existing tenants without authorizations. (SUMF, ¶ 33; Exhibit D, ¶ 14; Exhibit E pp. 185-186).

Accordingly, the Agreement between FAS and Goodstein cannot sustain plaintiff's claim of a search conducted under "false pretenses."  Moreover, to the extent that the Court would find that the Agreement is applicable to the "social searches" conducted by FAS, by its terms,

Goodstein represented that it would be conducting searches for "tenant screening purposes." Thus, in contrast to the defendant in the *Ali* case who inaccurately represented in its agreement with the credit reporting agency that it was conducting searches "in connection with credit transactions, or, if applicable, for employment purposes . . ." Goodstein cannot be said to have employed "false pretenses" as there is no dispute that the searches in the case at bar were conducted for "tenant screening purposes."

### POINT VI
### Goodstein Did Not Willfully Violate the FCRA

15 USCS § 1681n(a) governs civil liability for "willful noncompliance" with the FCRA. *See also Barash v. Ford Motor Credit Corp.*, 2007 U.S. Dist. LEXIS 44641 (E.D.N.Y. June 20, 2007). The text of the FCRA provides no definition of "willful," but courts typically interpret this term to require a demonstration that the defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others." *Pinner v. Schmidt*, 805 F.2d 1258, 1263(5th Cir. 1986); *see generally*, *Northrop v. Hoffman of Simsbury, Inc.*, 12 Fed. Appx. 44 (2d Cir. 2001); *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 418 (4th Cir. 2001) (to prove willfulness under the FCRA, plaintiffs must "show that the defendant knowingly and intentionally committed an act in conscious disregard for the rights of the consumer"); *Lusk v. TRW, Inc,* 1999 U.S. App. LEXIS 1848 (6th Cir. 1999) (unreported) (reasoning that a plaintiff must show that defendant knew they were violating the FCRA when they requested the report).

In construing "willful" noncompliance with regard to the FCRA, the U.S. Supreme Court has recently held that "both knowing and reckless disregard of the law" can create liability for punitive damages. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 127 S. Ct. 2201 (2007). In so ruling, the Supreme Court adopted the common law definition of recklessness: "action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.*

at 2215 (internal quotation marks and citation omitted). Thus, Goodstein cannot be held to be acting in reckless disregard of the FCRA unless its actions were not only a violation under a reasonable reading of the statute's terms, but also that Goodstein ran a risk of violating the law substantially greater than the risk associated with a reading of the statute that was merely careless. *Id.* The plaintiff must show evidence that "might have warned [Goodstein] away from the view it took." *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980 (D.C. Cir. 2008) (citing *Safeco*, 127 S. Ct. at 2216). There is simply no evidence in the record to support the claim that Goodstein acted in reckless disregard of the FCRA.

In the case at bar, the evidence establishes that there has been no violation of the FCRA and to the extent that the Court would determine otherwise, such violation could not be deemed knowing or in reckless disregard of the FCRA. As detailed throughout this brief, there is indisputable evidence that establishes that any violation of the FCRA by Goodstein in obtaining the "social search" could not been deemed "willful" as a matter of law, because:

- the "social search" ordered by Goodstein was not a "consumer report" and, thus, not governed by the FCRA (*See* Points I and III, *supra*);

- the "social search" was obtained for a permissible purpose in that it was used to confirm a rent-stabilized tenant's primary residence and, hence, that tenant's continuing eligibility for renewal of the rent-stabilized lease (*See* Point IV(A), *supra*);

- the sex offender component of the "social search" was obtained for permissible purposes as a matter of public policy (*See* Point IV (B), *supra*);

- the "social search" was not obtained under "false pretenses" because the evidence confirms that Goodstein did not: (a) falsely input a wrong address for the plaintiff when ordering the search; or (b) falsely represent the basis for obtaining the "social search" from FAS [the credit reporting agency] (*See* Point V, *supra*); and

- the written agreement between FAS and Goodstein did not apply to "social searches" and, assuming for the sake of argument that it did, Goodstein reasonably believed it did not need prior authorization from the tenant to order the "social search" based upon, *inter alia,* the credit reporting agency's clear distinction between ordering a "social search" versus a "credit report" (*See* Point V, *supra*);

Based upon the foregoing, Goodstein cannot be found to have "willfully" violated the FCRA.

## POINT VII

### Plaintiff's General Business Law §349 Claim Fails

Plaintiff's remaining cause of action seeks damages resulting from an alleged violation of New York State General Business Law §349. (Exhibit A ¶¶ 51-58). As the Second Circuit has generally reiterated, "[a] §349 claim has three elements: (1) the defendant's challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been misleading in a material way, and (3) the plaintiff must have sustained injury as a result." *Cohen v. J.P. Morgan Chase & Co.*, 498 F.3d 111 (2d Cir. 2007) (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)). A plaintiff must prove actual injury flowing from the deceptive acts or practices. *Id. See also, Marcus v. AT&T Co.*, 138 F.3d 46 (2d Cir. 1998); *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 709 N.Y.S.2d 892 (2000). The conduct alleged by plaintiff in this case relates to Goodstein's ordering of the "social search" via FAS's website. As detailed above, there is simply no evidence to establish that Goodstein's actions were "misleading in a material way." *See* Points III, IV and V, *supra*. Moreover, plaintiff has failed to establish actual injury. In fact, as discussed in Point I, *supra*, plaintiff's abandonment of "all claims in the complaint for actual damages," (*see* Exhibit K) vitiates this claim as plaintiff cannot establish any viable damages. Alternatively, plaintiff has failed to prove how conducting a "social search" creates a consumer injury or harm to the public interest. Absent any evidence to the contrary, there can be no question of material facts as to whether Goodstein violated General Business Law § 349 and summary judgment should be granted as to defendant Goodstein.

## CONCLUSION

WHEREFORE, for reasons stated herein, Defendant, Goodstein Management Inc., requests that the Court enter an Order granting Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and enter judgment accordingly.  Defendant further requests such other and further relief, including attorneys' fees and costs, to which the Court deems necessary and proper.

Dated:     New York, New York
           January 23, 2009

                              Respectfully submitted,

                              WILSON, ELSER, MOSKOWITZ,
                              EDELMAN & DICKER LLP

                              By:_____
                              Brett A. Scher
                              Lauren J. Rocklin
                              150 East 42nd Street
                              New York, New York 10017-5639
                              (212) 490-3000
                              File #: 00873.02328